Davina Shoumer (Bar No. 358336)
Email: davina@coastkeeper.org
Sarah Spinuzzi (Bar No. 305658)
Email: Sarah@coastkeeper.org
ORANGE COUNTY COASTKEEPER
INLAND EMPIRE WATERKEEPER
3151 Airway Ave F-110
Costa Mesa, CA 92626

*Attorneys for Plaintiffs Inland Empire Waterkeeper & Orange County Coastkeeper*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of Orange County Coastkeeper, and ORANGE COUNTY COASTKEEPER, a California nonprofit public benefit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNLIMITED PLASTICS, INC., a California stock corporation,<br><br>Defendant. | Civil Case No. 8:25-cv-2482<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively, "Plaintiffs" or "Waterkeeper"), by and through counsel, hereby allege:

I. **JURISDICTION AND VENUE**

1. Plaintiffs bring this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365.

2. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United

States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

3.     On September 5, 2025, Plaintiffs issued a 60-day Notice of Violation and Intent to Sue letter ("Notice Letter"), attached hereto as Exhibit A and incorporated by reference herein, to Unlimited Plastics, Inc. ("Unlimited Plastics" or "Defendant"), as owner and/or operator of the facility located at 425 S. Rancho Ave., Colton, CA 92324 ("Facility"). The Notice Letter informed Defendant of the violations of the CWA, and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020) (hereinafter, "General Permit" or "Permit") at the Facility. The Notice Letter informed Defendant of Plaintiffs' intent to file suit against Defendant to enforce the CWA and General Permit.

4.     The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region 9, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

5.     Sixty days have passed since the Notice Letter was sent via certified mail to Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA, US DOJ, nor the State of California have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter

and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.    Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the CWA and General Permit violations are located within this judicial district.

7.    Plaintiffs seek relief for Defendant's substantive and procedural violations of the General Permit and the CWA resulting from industrial activities at the Facility.

## II.    INTRODUCTION

8.    This Complaint seeks relief for the Defendant's unlawful discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, Plaintiffs are informed and believe, and thereon allege, that Defendant's discharges of pollutants from the Facility enter a storm drain, a point source, which ultimately discharges into the Upper Santa Ana River, which then discharges into the Pacific Ocean (collectively, the "Receiving Waters"), Waters of the United States, in violation of the substantive and procedural requirements of the CWA and General Permit. These violations have been occurring since at least September 5, 2020, and are ongoing and continuous.

9.    With every significant rainfall event, large amounts of polluted storm water originating from industrial operations such as the Facility pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for a significant amount of the total pollution entering surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals such as aluminum, iron, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have

for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

## III.   PARTIES

### A.   Inland Empire Waterkeeper and Orange County Coastkeeper

10.   Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Founded in 1999, Orange County Coastkeeper is a nonprofit public benefit corporation organized under the laws of the State of California with its office located in Costa Mesa, California. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506. Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 8,216 members who live and/or recreate in and around the Santa Ana River watershed.

11.   Waterkeeper's mission is to protect and enhance the water quality of the Upper Santa Ana River Watershed through programs of advocacy, education, research, restoration, and enforcement. Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, when necessary, directly initiates enforcement actions on behalf of itself and its members.

12.   Members of Waterkeeper enjoy the waters that storm water from the Facility discharges into, including the Santa Ana River. Members of Waterkeeper use these waterways to participate in a variety of water sports and other activities including fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility harms Waterkeeper's members by negatively impacting their use and enjoyment of the Receiving Waters.

13. Defendant's failure to comply with the procedural and substantive requirements of the CWA and General Permit, including discharging polluted storm water from the Facility, failing to report such pollution, and failing to improve the quality of storm water discharges from the Facility in accordance with the General Permit, degrades water quality and harms aquatic life in the Receiving Waters. Further, such actions and/or inaction impairs Waterkeeper members' use and enjoyment of those Receiving Waters, thus giving Plaintiffs standing on behalf of its members.

14. The violations of the CWA and General Permit at the Facility are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and General Permit. The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities.

15. Defendant's failure to comply with the procedural requirements of the CWA and General Permit means that Waterkeeper's members are unable to obtain statutorily required information on Defendant's storm water and storm water management practices. Thus, Plaintiffs face both informational harm and informational injury because the CWA and General Permit provide a right to information, but Defendant has often failed to provide such information, as detailed below. Further, such informational harm and injury gives Plaintiffs standing on behalf of its members.

16. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.    The Owner and/or Operator of the Facility**

17. Information available to Plaintiffs indicates that the Facility is currently owned and operated by Unlimited Plastics located at 425 S. Rancho Ave., Colton, CA 92324.

18. Information available to Plaintiffs indicates that Unlimited Plastics has

1  owned and operated the Facility at all times relevant to this Complaint.

2      19.    Information available to Plaintiffs indicates that the property on which the
3  Facility operates is owned by Guillermo Rodriguez, Rosalva Rodriguez, and/or the
4  Rodriguez Family Trust.

5      20.    Unlimited Plastics, as owner and/or operator of the Facility, is the responsible
6  party under the CWA.

7      21.    Guillermo Rodriguez, Rosalva Rodriguez, and/or the Rodriguez Family
8  Trust, as landowners, have sufficient knowledge and control over the Facility to also be
9  responsible parties under the CWA.

10      22.    Plaintiffs are informed and believe, and thereon allege, that Unlimited
11  Plastics is a stock corporation formed in California and registered to do business in
12  California.

13      23.    Plaintiffs are informed and believe, and thereon allege, that Unlimited
14  Plastic's registered agent for service of process is Guillermo Rodriguez, 425 S. Rancho
15  Ave., Colton, CA 92324.

16  **IV.    LEGAL BACKGROUND**

17       **A.    The Clean Water Act**

18      24.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the
19  discharge of any pollutant into waters of the United States unless the discharge complies
20  with various enumerated sections of the CWA. Among other things, Section 301(a)
21  prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit
22  issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

23      25.    Section 301(b) of the CWA requires that all point source dischargers,
24  including those discharging polluted storm water, must achieve technology-based effluent
25  limitations by utilizing Best Available Technology Economically Achievable ("BAT") for
26  toxic and nonconventional pollutants and the Best Conventional Pollutant Control
27  Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

28

26.    The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

27.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

28.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 120.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, and wetlands adjacent to navigable waters. *Id.*

29.    Section 505(a)(1) and Section 505(f) of the CWA provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

30.    Defendant is a "person" within the meaning of Section 502(5) of the CWA. *See* 33 U.S.C. § 1362(5).

31.    A third-party enforcement action for injunctive relief is authorized under Section 505(a) of the CWA. *See* 33 U.S.C. § 1365(a).

32.    Each separate violation of the CWA subjects the violator to a penalty up to $68,445 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 8, 2025. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

33.    Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    The General Permit**

34.    Section 402(p) of the CWA establishes a framework for regulating industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).

35.     States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C § 1342.

36.     California is a state authorized by the EPA to issue NPDES permits.

37.     In California, the State Board and nine regional water boards are charged with regulating pollutants to protect California's water resources and improve water quality. *See* Cal. Water Code § 13001.

38.     The General Permit is a statewide NPDES permit issued by the State Board pursuant to the CWA.

39.     The General Permit was issued on July 1, 2015, pursuant to Order No. 2014-0057-DWQ.

40.     On November 6, 2018, the State Board amended the General Permit with Order No. 2015-0122-DWQ, incorporating: 1) the Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use.

41.     In order to lawfully discharge storm water to waters of the United States in California, industrial dischargers must secure coverage under the General Permit and comply with its terms or obtain and comply with an individual NPDES permit. *See* General Permit § I.A.12.

42.     Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* General Permit § I.A.17.

43.     Violations of the General Permit are violations of the CWA. *See* General Permit § XXI.A.

## C.    The General Permit's Technology-Based Effluent Limitations

44.    The General Permit's Effluent Limitations require dischargers covered by the General Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of BAT for toxic or non-conventional pollutants, and BCT for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, iron, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* General Permit § V.A.

45.    Pursuant to the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); *Id*.

46.    EPA's 2015 NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the General Permit via the Table 2 Numeric Action Levels ("NALs"). *See* General Permit § XI.B.

47.    The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. General Permit § V.A.

48.    The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; O&G – 15 mg/L; copper ("Cu") – 0.0332 mg/L; aluminum ("Al") – 0.75 mg/L; iron ("Fe") – 1.0 mg/L; chemical oxygen demand ("COD") – 120 mg/L; and zinc ("Zn") – 0.26 mg/L.

49.    The General Permit establishes annual NALs and instantaneous maximum NALs. The following annual NALs have been established under the General Permit: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; O&G – 15 mg/L; Cu – 0.0332 mg/L; Al – 0.75 mg/L; Fe – 1.0 mg/L; COD – 120 mg/L; and Zn – 0.26 mg/L. An exceedance of an

1    annual NAL occurs when the average of all samples obtained for an entire facility during
2    a single reporting year is greater than a particular annual NAL. The reporting year runs
3    from July 1 to June 30. The General Permit also establishes the following instantaneous
4    maximum NALs: pH – 6.0 – 9.0 standard units; TSS – 400 mg/L and O&G – 25 mg/L.

5    50.    Discharges from an industrial facility containing pollutant concentrations that
6    exceed EPA Benchmarks or NALs indicate that BMPs that meet BAT for toxic and non-
7    conventional pollutants and/or BCT for conventional pollutants have not been developed
8    and/or implemented at the Facility. General Permit § V.A.

9    **D.    The General Permit's Storm Water Pollution Prevention Plan**
10   **Requirements**

11   51.    Dischargers must develop and implement a Storm Water Pollution
12   Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial
13   activities. General Permit, §§ I.J. (Finding 68), and X.B. The SWPPP must meet all of the
14   requirements of the General Permit. *Id*., §§ X.A-H.; *see also id*., Appendix 1. The SWPPP
15   must identify and evaluate sources of pollutants associated with industrial activities that
16   may affect the quality of storm water and authorized non-storm water discharges from the
17   facility. *Id*. at § X.G.

18   52.    The SWPPP must include: a narrative description and summary of all
19   industrial activity; potential sources of pollutants, and potential pollutants; a site map
20   indicating the storm water conveyance system, associated points of discharge, direction of
21   flow, areas of actual and potential pollutant contact, including the extent of pollution-
22   generating activities, nearby water bodies, and pollutant control measures; a description
23   of storm water management practices; a description of the BMPs to be implemented to
24   reduce or prevent pollutants in storm water discharges and authorized non-storm water
25   discharges; the identification and elimination of non-storm water discharges; the location
26   where significant materials are being shipped, stored, received, and handled, as well as the
27   typical quantities of such materials and the frequency with which they are handled; a

28

description of dust and particulate-generating activities; and an identification and description of individuals and  their  current responsibilities for developing and implementing the SWPPP. General Permit § X.

53.  The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. at § X.

54.  The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. *Id*. at §§ X.A-B. The General Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. *Id*. at §§ X.B. and XV.

55.  The SWPPP and site map(s) must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id*. at § X.B.1.

**E.    The General Permit's Special Requirements for Facilities that Handle Plastic Materials**

56.  The General Permit defines Plastic Materials to include the following types of sources of Plastic Materials: virgin and recycled plastic resin pellets, powders, flakes, powdered additives, regrind, dust, and other types of preproduction plastics with the potential to discharge or migrate off-site. *Id* at § I.Q.

57.  The General Permit requires facilities that handle Plastic Materials to

implement BMPs that eliminate discharges of plastics in storm water in addition to the other requirements of the General Permit that are applicable to all other Industrial Materials and Activities. General Permit § XVIII.

58.    The General Permit refers to any dischargers' facility handling Plastic Materials as Plastic Facilities. *Id.*

59.    Any Plastics Facility covered under the General Permit that manufactures, transports, stores, or consumes these materials shall submit information to the State Water Board in their Permit Registration Documents ("PRDs"), including the type and form of plastics, and which BMPs are implemented at the facility to prevent illicit discharges. *Id.* at § XVIII.A.

60.    At a minimum, Plastics Facilities shall implement and include in their SWPPP: (a) Containment systems at each on-site storm drain discharge location down gradient of areas containing plastic materials. The containment system shall be designed to trap all particles retained by a 1mm mesh screen, with a treatment capacity of no less than the peak flow rate from a one-year, one-hour storm; (b) When a containment system is infeasible, or poses the potential to cause an illicit discharge, the facility may propose a technically feasible alternative BMP or suite of BMPs and submit these BMPs to the Regional Water Board for approval; (c) Plastics Facilities shall use durable sealed containers designed not to rupture under typical loading and unloading activities at all points of plastic transfer and storage; (d) Plastic Facilities shall use capture devices as a form of secondary containment during transfers, loading, or unloading Plastic Materials; (e) Plastic Facilities shall have a vacuum or vacuum-type system for quick cleanup of fugitive plastic material available for employees; and (f) Plastic Facilities that handle Plastic Materials smaller than 1mm in size shall develop a containment system designed to trap the smallest plastic material handled at the facility with a treatment capacity of at least the peak flow rate from a one-year, one-hour storm or develop a feasible alternative BMP or suite of BMPs designed to achieve a similar or better performance and submit

these BMPs to the Regional Water Board for approval. General Permit § XVIII.A.

61.    Plastic Facilities are exempt from the Water Code requirement to install a containment system under section 13367 of the Water Code if they certify and submit a valid No Exposure Certification to SMARTS in accordance with Section XVII of the General Permit or if they follow and implement a suite of eight BMPs outlined in Section XVIII.A.2.b of the General Permit. *Id* at § XVIII.A.2.b.

62.    The suite of eight BMPs are as follows: (1) Annually train employees handling Plastic Materials. Training shall include environmental hazards of plastic discharges, employee responsibility for corrective actions to prevent errant Plastic Materials, and standard procedures for containing, cleaning, and disposing of errant Plastic Materials; (2) Immediately fix any Plastic Materials containers that are punctured or leaking and shall clean up any errant material in a timely manner; (3) Manage outdoor waste disposal of Plastic Materials in a manner that prevents the materials from leaking from waste disposal containers or during waste hauling; (4) Plastic Facilities that operate outdoor conveyance systems for Plastic Materials shall maintain the system in good operating condition. The system shall be sealed or filtered in such a way as to prevent the escape of materials when in operation. When not in operation, all connection points shall be sealed, capped, or filtered so as to not allow material to escape. Employees operating the conveyance system shall be trained how to operate in a manner that prevents the loss of materials such as secondary containment, immediate spill response, and checks to ensure the system is empty during connection changes; (5) Plastic Facilities that maintain outdoor storage of Plastic Materials shall do so in a durable, permanent structure that prevents exposure to weather that could cause the material to migrate or discharge in storm water; (6) Maintain a schedule for regular housekeeping and routine inspection for errant Plastic Materials. The Plastics Facility shall ensure that their employees follow the schedule; (7) PRDs shall include the housekeeping and routine inspection schedule, spill response and prevention procedures, and employee

training materials regarding plastic material handling; (8) Correct any deficiencies in the employment of the above BMPs that result in errant Plastic Materials that may discharge or migrate off-site in a timely manner. Any Plastic Materials that are discharged or that migrate off-site constitute an illicit discharge in violation of this General Permit. General Permit § XVIII.A.2.b.

**F.    The General Permit's Monitoring Requirements**

63.    The General Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. *Id*. at §§ X.I and XI.

64.    The General Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all the requirements of the General Permit. *Id*. at §§ X.I and XI.A-D.

65.    The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the General Permit's Effluent Limitations, Receiving Water Limitations, and Discharge Prohibitions. *See Id*. at § XI.

66.    An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants from the facility's discharges, and the MIP is evaluated and revised whenever appropriate to ensure compliance with the General Permit. *See id*.

67.    The General Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the Permit's terms. *Id* at § XI.B.

68.    Section XI.A.1 of the General Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution.

69.    Section XI.A.2 of the General Permit requires dischargers to conduct visual

observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odors, and the source of any pollutants in storm water discharges from the facility.

70.    Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* General Permit § XI.A.3.

71.    The General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. *Id*. at § XI.B.4.

72.    Section XI.B.1 of the General Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.

73.    The General Permit requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year (July 1 to December 31), and two QSEs within the second half of each reporting year (January 1 to June 30). *Id*. at § XI.B.2.

74.    Each storm water sample must be analyzed for TSS, pH, O&G, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment—in addition to those required under the Standard Industrial Classification ("SIC") code. *Id*. at XI.B.6.

75.    Section XI.B.6.c of the General Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

76.    Section XI.B.6.f of the General Permit requires dischargers to analyze additional parameters required by the Regional Board.

77.    Section XI.B.6.e of the General Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs.

78.    Section XI.B.11 of the General Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via the Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty days of obtaining all results for each sampling event.

### G.    The General Permit's Exceedance Response Actions Requirements

79.    Under the General Permit, facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances. *See* General Permit § XII.

80.    An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. *Id*. at § XII.A.1.

81.    An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. *Id*. at § XII.A.

82.    Upon receiving NOI coverage, all permittees are deemed in "Baseline status." *Id*. at § XII.B.

83.    A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id*. at § XII.C.

84.    Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *Id*. at § XII.C.

85.    By October 1 following commencement of Level 1 status, permittees are required to complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s), and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions

necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit. General Permit §§ XII.C.1.a-c.

86.    Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id*. at § XII.C.1.c.

87.    Based upon the Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. *Id*. at §§ XII.C.2.a.i-ii.

88.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id*. at § XII.C.2.a.iii.

89.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id*. at § XII.C.2.b.

90.    A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. *Id*. at § XII.D.

91.    Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *Id*. at § XII.D.

92.    A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1

following the reporting year during which the NAL exceedances occurred. General Permit § XII.D.1.a.

93.     On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *Id*. at § XII.D.

94.     Dischargers with Level 2 status are required to annually update their Level 2 ERA Technical Reports based upon additional NAL exceedances of the same parameter and same drainage area, facility operational changes, pollutant source(s) changes, and/or information that becomes available via compliance activities. *Id*. at § XII.D.3.c.

95.     Dischargers with Level 2 status who submit one of the above demonstrations and have implemented BMPs to prevent future NAL exceedance(s) for the Level 2 parameter(s) shall return to baseline status for that parameter, if results from four subsequent consecutive QSEs sampled indicate no additional NAL exceedance(s) for that parameter(s). *Id*. at § XII.D.4.a.

96.     If future NAL exceedances occur for the same parameter(s), the Dischargers' Baseline status will return to Level 2 status on July 1 in the subsequent reporting year during which the NAL exceedance(s) occurred. *Id*.

### H.     The General Permit's Annual Reporting Requirements

97.     Section XVI of the General Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

98.     The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the applicable requirements of the General Permit, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *Id*. at § XVI.

99.     Annual Reports are certified by the legally responsible person under penalty of perjury.

## V.    FACTUAL BACKGROUND

### A.    The Facility's General Permit Coverage

100.    Plaintiffs allege that Unlimited Plastics has obtained General Permit coverage for the Facility since at least 2016, by submitting an NOI to the State Board.

101.    Plaintiffs allege that Unlimited Plastics submitted an updated NOI to SMARTS that is dated November 28, 2016.

102.    Defendant's NOI identifies the operator of the Facility as Unlimited Plastics located at 425 S. Rancho Ave., Colton, CA 92324.

103.    Defendant's NOI lists the Facility site size as 3 acres, with 2 acres of industrial area exposed to storm water.

104.    The Waste Discharger Identification ("WDID") number listed on Defendant's most recent SWPPP revised on February 2017 and uploaded to SMARTS is 8 36I026996.

105.    The Facility's operating hours, per Defendant's SWPPP, are Monday through Friday, 7:30 am – 11:30 pm.

106.    Defendant's NOI and SWPPP lists the Santa Ana River as the Facility's receiving water.

107.    SMARTS lists the Facility's coverage under the General Permit as "Active."

108.    Defendant's NOI and SWPPP lists the SIC code for the Facility as 5093 (Scrap and Waste Materials).

109.    Defendant must obtain General Permit coverage for the entire facility. *See* General Permit, § XVII.E.1.

110.    Plaintiffs are informed and believe, and thereon allege, that the Facility is required to comply with the special requirements of facilities that handle Plastics Materials as set forth in the General Permit Section XVIII.

111.    Plaintiffs are informed and believe, and thereon allege, that Defendant is required to sample for pH, O&G, TSS, additional parameters that serve as indicators of

the presence of all industrial pollutants likely to be present in discharges, additional applicable industrial parameters related to 303(d) listed impairments, and additional parameters required by the Santa Ana Regional Board. General Permit Monitoring XI.B.6.

**B.    Industrial Activities and Pollutant Sources at the Facility**

112.    Plaintiffs are informed and believe, and thereon allege, that Defendant is a plastics recycling company that grinds plastic materials for repurposing and wholesale.

113.    Plaintiffs are informed and believe, and thereon allege, that Defendant's industrial activities include plastic grinding, manufacturing of plastic remnants, manufacturing of plastic materials, and movement and storage of both raw and finished plastic materials.

114.    Plaintiffs are informed and believe, and thereon allege, that industrial activities at the Facility can contain pH-affecting substances; metals, such as aluminum, iron, and lead; toxic metals, such as zinc; TSS; O&G; COD; plastics; and other chemical pollutants.

115.    Plaintiffs are informed and believe, and thereon allege, that the Facility is required to implement BMPs to eliminate the discharges of plastics in storm water in addition to the other requirements of the General Permit that are applicable to all other Industrial Materials and Activities.

116.    Plaintiffs are informed and believe, and thereon allege, that industrial activities at the Facility occur outside without adequate cover or containment, resulting in discharges of polluted storm water.

117.    Plaintiffs are informed and believe, and thereon allege, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

118.    Plaintiffs allege that Defendant has not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

119.    BMPs are necessary at the Facility to prevent the exposure of pollutants to

precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

120.   Plaintiffs are informed and believe, and thereon allege, that Defendant's failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility into the Receiving Waters in violation of the General Permit and the CWA.

121.   Plaintiffs are informed and believe, and thereon allege, that illegal discharges of polluted storm water negatively impact Plaintiffs' members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

**C.    The Facility's Storm Water Flow, Sampling Points, and Discharges to the Receiving Waters**

122.   Plaintiffs are informed and believe, and thereon allege, that storm water from the Facility discharges to a storm drain before discharging into the Santa Ana River, which then discharges into the Pacific Ocean.

123.   The Facility's 2017 Site Map on their SWPPP indicates that the Facility has two drainage areas and one sampling and observation point. The SWPPP indicates that the storm water at the Facility flows to two discharge points before commingling and discharging into the municipal storm drain system.

124.   Plaintiffs allege that the Santa Ana River and the Pacific Ocean are all waters of the United States. 33 U.S.C. § 1362(7).

**VI.    DEFENDANT'S VIOLATIONS OF THE GENERAL PERMIT AND CWA**

**A.    Defendant's Violations of the General Permit's Technology-Based Effluent Limitations**

125.   Plaintiffs are informed and believe, and thereon allege, that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility.

126.    Plaintiffs allege that storm water discharges from the Facility contain concentrations of pollutants associated with Defendant's industrial activities above EPA Benchmarks and incorporated into the General Permit as NALs.

127.    Plaintiffs allege that storm water discharges from the Facility contain concentrations of pollutants associated with Defendant's industrial activities that exceed annual NALs.

128.    Plaintiffs are informed and believe, and thereon allege, that storm water discharges from the Facility contain concentrations of pollutants with exceedances of NALs for TSS, Al, Fe, Zn, and COD.

129.    Plaintiffs are informed and believe, and thereon allege, that for the 2020-2021 reporting year, the Facility did not conduct any sampling.

130.    Plaintiffs are informed and believe, and thereon allege, that for the 2021-2022 reporting year, the Facility did not conduct any sampling.

131.    Plaintiffs are informed and believe, and thereon allege, that for the 2022-2023 reporting year, the Facility did not conduct any sampling.

132.    Plaintiffs are informed and believe, and thereon allege, that for the 2023-2024 reporting year, the Facility exceeded annual NALs for TSS, Al, Fe, Zn, and COD.

133.    Plaintiffs are informed and believe, and thereon allege, that for the 2024-2025 reporting year, the Facility did not conduct any sampling.

134.    Plaintiffs are informed and believe, and thereon allege, that had Defendant conducted additional sampling as required by the General Permit and CWA, the Facility would have shown additional NAL exceedances.

135.    Plaintiffs allege that the Facility's exceedances of applicable NALs and EPA Benchmarks demonstrate that Defendant has failed and continues to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards.

136.    For example, Defendant exceeded NAL limitations for TSS, Al, Fe, and COD

during the 2017-2018 reporting year. During the 2018-2019 reporting year, Defendant again exceeded NAL limitations for TSS, Al, Fe, and COD. During the 2023-2024 reporting year, Defendant again exceeded NAL limitations for TSS and exceeded NAL limitations for Zn.

137.    During the applicable statute of limitations period, Defendant consistently remained in Level 2 for TSS, Al, Fe, and COD. Additionally, during the applicable statute of limitations period, Defendant entered Level 1 for Zn.

138.    Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of the CWA.

139.    Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least September 5, 2020.

**B. Defendant's Violations of the General Permit's SWPPP Requirements**

140.    The Facility's most recently updated SWPPP is publicly available via the SMARTS database and is dated February 2017.

141.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the General Permit.

142.    Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with Section X.G.2 of the General Permit. The SWPPP does not conduct a full assessment of potential pollutant sources. For example, the assessment fails to specify: the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and the estimated effectiveness of implementing minimum BMPs to reduce or prevent these pollutants. General Permit § X.G.2.

143.    Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with Section X.D.1 of the General Permit. The SWPPP does not establish a Pollution Prevention Team. For example, Section 1.5 of the SWPPP states "TBD" as the

Maintenance Supervisor under the Storm Water Pollution Prevention Team instead of identifying the individual responsible, as required under the General Permit. General Permit § X.D.1.

144. Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with Section X.H.2 of the General Permit. The SWPPP does not conduct a proper assessment of Best Management Practices. For example, the Advanced BMP section of the SWPPP simply restates the IGP and does not describe what Advanced BMPs are in place at the Facility beyond the Facility's main building itself. General Permit § X.H.2.

145. Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with Section X.B, X.C, XII.C, and XII.D of the General Permit. Defendant failed to revise their SWPP whenever necessary. For example, Defendant is required to update their SWPPP after submitting ERA documentation when their sampling results trigger a Level 1 and/or Level 2 ERA Report. Defendant triggered a Level 2 Action Plan for TSS, Al, Fe, and COD during the 2018-2019 Reporting Year and a Level 1 ERA Report for Zn during the 2023-2024 Reporting Year. Not only did Defendant not submit either of the required ERA Documentation, but they also did not update their SWPPP since 2017. General Permit § X.B, X.C, XII.C, and XII.D.

146. Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with the requirements of Section XVIII of the General Permit. The SWPPP does not properly address or comply with the special requirements of facilities that handle plastic materials. For example, the SWPPP does not: include a containment system at each on-site storm drain discharge location down gradient of areas containing plastic materials; propose a technically feasible alternative BMP or suite of BMPs submitted to the Regional Water Board for approval; state that durable sealed containers designed not to rupture under typical loading and unloading activities at all points of plastic transfer and storage are used at the Facility; state what kind of capture device system the Facility has in place

as a form of secondary containment during transfers; state that a vacuum or vacuum-type system for quick cleanup of fugitive plastic materials is available for employees; or state that the Facility developed a containment system designed to trap the smallest plastic material handled at the facility with a treatment capacity of at least the peak flow rate from a one-year, one-hour storm, or developed a feasible alternative BMP or suite of BMPs submitted to the Regional Water Board for approval. General Permit, Special Requirements Plastic Materials XVIII.A.1.a-f. While Defendant does have a section for the requirements of facilities that handle Plastic Materials in their SWPPP, this section only recites the requirements under the General Permit and does not state how the Facility is specifically implementing these requirements. General Permit § XVIII.

147.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants.

148.    Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the General Permit and the CWA.

149.    Plaintiffs are informed and believe, and thereon allege, that Defendant has been in daily and continuous violation of the General Permit's SWPPP requirements since at least September 5, 2020.

## C.    Defendant's Violations of the General Permit's Special Requirements for Facilities that Handle Plastic Materials

150.    Plaintiffs are informed and believe, and thereon allege, that Defendant is required to comply with Section XVIII of the General Permit, Special Requirements for facilities that handle Plastic Materials.

151.    Defendant's SWPPP states that the Facility does not have a containment system that completely contains and controls plastic materials. On that basis, Plaintiffs are informed and believe, and thereon allege, that Defendant is not in compliance with

Section XVIII.A.1.a of the General Permit, which requires Plastic Facilities to implement containment systems at each on-site storm drain discharge location down gradient of areas containing plastic materials.

152. Upon a search of publicly available information on SMARTS and a Public Records Act request, no alternative BMPs were submitted to the Regional Water Board for approval. Plaintiffs are informed and believe, and thereon allege, that Defendant is not in compliance with Section XVIII.A.1.b of the General Permit, which requires facilities to propose a technically feasible alternative BMP or suite of BMPs when a containment system is infeasible, and submit these alternative BMPs to the Regional Water Board for approval.

153. Plaintiffs are informed and believe, and thereon allege, that Defendant is not in compliance with Section XVIII.A.1.c of the General Permit, which requires Plastic Facilities to use durable sealed containers designed not to rupture under typical loading and unloading activities at all points of plastic transfer and storage.

154. Plaintiffs are informed and believe, and thereon allege, that Defendant is not in compliance with Section XVIII.A.1.d of the General Permit, which requires Plastic Facilities to use capture devices as a form of secondary containment during transfers, loading, or unloading Plastic Materials.

155. Plaintiffs are informed and believe, and thereon allege, that Defendant is not in compliance with Section XVIII.A.1.e of the General Permit, which requires Plastic Facilities to have a vacuum or vacuum-type system for quick cleanup of fugitive plastic materials available for employees.

156. Plaintiffs are informed and believe, and thereon allege, that Defendant is not in compliance with Section XVIII.A.1.f of the General Permit, which requires Plastic Facilities that handle Plastic Materials smaller than 1mm to develop a containment system designed to trap the smallest plastic material handled at the facility with a treatment capacity of at least the peak flow rate from a one-year, one-hour storm or

develop a feasible alternative BMP or suite of BMPs submitted to the Regional Water Board for approval. Defendant states that the Facility does not have a containment system in its SWPPP, and upon a search of publicly available information on SMARTS and a Public Records Act request, no BMPs were submitted to the Regional Water Board for approval.

157. Plaintiffs are informed and believe, and thereon allege, that Defendant is not exempt from the Water Code requirement to install a containment system under section 13367 of the Water Code because they neither certified and submitted a valid No Exposure Certification to SMARTS nor have they implemented all eight of the suite of eight BMPs outlined in Section XVIII.A.2.b of the General Permit.

158. Plaintiffs are informed and believe, and thereon allege, that Defendant fails to comply with Section XVIII.A.2.b.v of the General Permit, which requires Plastic Facilities that maintain outdoor storage of Plastic Materials to do so in a durable, permanent structure that prevents exposure to weather that could cause the material to migrate or discharge in storm water.

159. Plaintiffs allege that Defendant stores their material outside and uncovered, thus not in a way that prevents exposure to weather.

160. Plaintiffs are informed and believe, and thereon allege, that Defendant fails to comply with Section XVIII.A.2.b.vi of the General Permit, which requires Plastics Facilities to maintain a structure for regular housekeeping and routine inspection for errand Plastic Materials and to ensure that employees are following the schedule.

161. Plaintiffs are informed and believe, and thereon allege, that Defendant fails to comply with Section XVIII.A.2.b.vii of the General Permit, which requires PRDs to include the housekeeping and routine inspection schedule, spill response and prevention procedures, and employee training materials regarding plastic material handling. Plaintiffs believe this because a review of publicly available documents on SMARTS and a Public Records Act request do not identify these items in PRDs.

162.    Consequently, Plaintiffs thereon allege that the exemption for installing a containment structure does not apply to the Facility. Thus, Plaintiffs allege that the Facility is required to install a containment structure under Section 13367.e.1 of the Water Code and Section XVIII.A.1.f of the General Permit.

### D. Defendant's Violations of the General Permit's Monitoring Implementation Plan Requirements

163.    Plaintiffs are informed and believe, and thereon allege, that Defendant has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP, in violation of the MIP requirements of the General Permit.

164.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to collect storm water discharge samples as required pursuant to Section XI.B.2 of the General Permit, which requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of each reporting year.

165.    Plaintiffs are informed and believe, and thereon allege, that in the 2020-2021 reporting year Defendant did not sample from any QSEs when they were required to sample from four QSEs. In the explanation for this question, Defendant stated, "There were only one or two QSEs during this reporting year during the opening period of the facility as limited opening hours were maintained during Covid-19 restrictions and situation." Plaintiffs are informed and believe, and thereon allege, that the fact that no sampling was conducted during this reporting year is a violation of the IGP.

166.    Plaintiffs are informed and believe, and thereon allege, that in the 2021-2022 reporting year Defendant did not sample from any QSEs when they were required to sample from four QSEs. In the explanation for this question, Defendant stated, "One QSE was sampled" but there were no sampling results submitted to SMARTS. Plaintiffs are informed and believe, and thereon allege, that the fact that no sampling was conducted

and/or reported during this reporting year is a violation of the IGP.

167.    Plaintiffs are informed and believe, and thereon allege, that in the 2022-2023 reporting year Defendant again did not sample from any QSEs when they were required to sample from four QSEs. Defendant did not give an explanation for their response. Plaintiffs are informed and believe, and thereon allege, that the fact that no sampling was conducted during this reporting year is a violation of the IGP.

168.    Plaintiffs are informed and believe, and thereon allege, that in the 2023-2024 reporting year Defendant only sampled from one QSEs when they were required to sample from four QSEs. Defendant did not give an explanation for their response. Plaintiffs are informed and believe, and thereon allege, that the fact that the required number of sampling was not conducted during this reporting year is a violation of the IGP.

169.    Plaintiffs are informed and believe, and thereon allege, that in the 2024-2025 reporting year Defendant did not sample from any QSEs when they were required to sample from four QSEs. Defendant did not give an explanation for their response. Plaintiffs are informed and believe, and thereon allege, that the fact that no sampling was conducted during this reporting year is a violation of the IGP.

170.    Plaintiffs are informed and believe, and thereon allege, that Defendant has not collected the required number of storm water samples during QSEs in any reporting year within the relevant period.

171.    Plaintiffs are informed and believe, and thereon allege, that Defendant's reporting erroneously indicates that Defendant was unable to collect the required samples because there were insufficient rain events.

172.    Climatological data obtained from the National Oceanic and Atmospheric Administration ("NOAA") demonstrates that there were additional opportunities to sample significant rain events during each reporting year. See Exhibit 2 of Notice Letter attached hereto as Exhibit A.

173.    Defendant's failure to conduct sampling and monitoring as required by the

General Permit demonstrates that it has failed to develop, implement, and/or revise a MIP that complies with the requirements of Section XI of the General Permit.

174. Plaintiffs are informed and believe, and thereon allege, that based upon the failure to collect the required number of samples, Defendant has failed and continues to fail to conduct and record adequate visual observations of storm water discharges since at least September 5, 2020 in violation of General Permit, Section XI.A.2.

175. Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to conduct and record all required monthly dry weather visual observations at the Facility.

176. Plaintiffs are informed and believe, and thereon allege, that Defendant has been in ongoing and continuous violation of the General Permit's monthly dry weather visual observation requirement since at least September 5, 2020.

177. Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to conduct and record all required sampling event visual observations at the Facility.

178. Plaintiffs are informed and believe, and thereon allege, that Defendant has been in ongoing and continuous violation of the General Permit's sampling event visual observation requirement since at least September 5, 2020.

179. Plaintiffs are informed and believe, and thereon allege, that Defendant is in violation of the General Permit and the CWA because Defendant has failed and continues to fail to adequately develop, implement, and/or revise its MIP in violation of the General Permit's MIP requirements.

**E.    Defendant's Violations of the General Permit's Exceedance Response Actions Requirements**

180. Plaintiffs are informed and believe, and thereon allege, that based on storm water sample results submitted by Defendant, the Facility entered Level 2 status for TSS, Al, Fe, and COD following the 2018-2019 reporting year.

181.    Plaintiffs are informed and believe, and thereon allege, that the Facility entered Level l status for Zn following the 2023-2024 reporting year.

182.    Plaintiffs are informed and believe, and thereon allege, that during the 2019-2020, 2020-2021, 2021-2022, 2022-2023, 2023-2024, and 2024-2025 reporting year, the Facility consistently remained in Level 2 for TSS, Al, Fe and COD.

183.    Plaintiffs are informed and believe, and thereon allege, that since entering Level 2 Status for TSS, Al, Fe, and COD, Defendant has not submitted any of their required ERA documentation to SMARTS.

184.    Plaintiffs are informed and believe, and thereon allege, that during the 2024-2025 reporting year, the Facility remained in Level 1 for Zn.

185.    Plaintiffs are informed and believe, and thereon allege, that since entering Level 1 Status for Zn, Defendant has not submitted their required ERA documentation to SMARTS.

186.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to take Exceedance Response Actions as required by General Permit Section XII.

187.    Plaintiffs are informed and believe, and thereon allege, that Defendant has been in daily and continuous violation of the General Permit's Exceedance Response Actions requirements since at least September 5, 2020.

188.    Plaintiffs are informed and believe, and thereon allege, that every day the Facility operates without satisfying General Permit's ERA requirements is a separate and distinct violation of the General Permit and the CWA, for which Defendant is liable.

## F.    Defendant's Failure to Comply with the General Permit's Reporting Requirements

189.    Plaintiffs allege that for the past five years, Defendant has failed and continues to fail to submit Annual Reports that comply with the General Permit's reporting requirements.

190.   Plaintiffs are informed and believe, and thereon allege, that in each of the Facility's annual report submitted, Defendant stated that they sampled the required number of QSEs despite failing to conduct four sampling events per reporting year.

191.   In their 2020-2021 Annual Report, Defendant checked "Yes" when asked if they sampled the required number of QSEs during the reporting year for all discharge locations even though they did not sample from any QSEs. Plaintiffs are informed and believe, and thereon allege, that it is an annual reporting violation of the IGP to check "Yes" in response to a question where the response should have been "No."

192.   In their 2021-2022 Annual Report, Defendant checked "Yes" when asked if they sampled the required number of QSEs during the reporting year for all discharge locations even though they did not sample from any QSEs. Plaintiffs are informed and believe, and thereon allege, that it is an annual reporting violation of the IGP to check "Yes" in response to a question where the response should have been "No."

193.   In their 2022-2023 Annual Report, Defendant checked "Yes" when asked if they sampled the required number of QSEs during the reporting year for all discharge locations even though they did not sample from any QSEs. Plaintiffs are informed and believe, and thereon allege, that it is an annual reporting violation of the IGP to check "Yes" in response to a question where the response should have been "No."

194.   In their 2023-2024 Annual Report, Defendant checked "Yes" when asked if they sampled the required number of QSEs during the reporting year for all discharge locations even though they only sampled from one QSE. Plaintiffs are informed and believe, and thereon allege, that it is an annual reporting violation of the IGP to check "Yes" in response to a question where the response should have been "No."

195.   In their 2024-2025 Annual Report, Defendant checked "Yes" when asked if they sampled the required number of QSEs during the reporting year for all discharge locations even though they only sampled from one QSE. Plaintiffs are informed and believe, and thereon allege, that it is an annual reporting violation of the IGP to check

"Yes" in response to a question where the response should have been "No."

196.   Plaintiffs are informed and believe, and thereon allege, that Defendant submitted Annual Reports to SMARTS which fail to comply with the General Permit, and as a result, Defendant is in daily violation of the General Permit.

197.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in daily and continuous violation of the General Permit's annual reporting requirements every day since at least July 1, 2021.

198.   Every day Defendant conducts operations at the Facility without reporting as required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

## VII.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the General Permit's Technology Based Effluent Limitations**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

199.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

200.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT in violation of Effluent Limitations V.A of the General Permit and the CWA, 33 U.S.C. § 1311(b).   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the General Permit and the CWA. General Permit § V.A.; 33 U.S.C. § 1311(b).

201.   Each day since September 5, 2020 that Defendant fails to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct

violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

202.   Defendant has been in violation of the BAT/BCT requirements every day since September 5, 2020. Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

203.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

204.   Plaintiffs are informed and believe, and thereon allege that, within the applicable statute of limitations, Defendant has failed and continues to fail to develop, implement, and/or revise an adequate SWPPP for the Facility, in violation of the General Permit.

205.   Each day since September 5, 2020 that Defendant has failed to develop, implement, and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

206.   Defendant has been in violation of the General Permit's SWPPP requirements every day since at least September 5, 2020. Defendant continues to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

## THIRD CAUSE OF ACTION

**Defendant's Failure to Satisfy the Special Requirements of Facilities that Handle Plastic Materials in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

207.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

208.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendant failed and continues to fail to satisfy the requirements of facilities that handle plastic materials, in violation of the General Permit.

209.   Each day since September 5, 2020 that Defendant has failed to satisfy the requirements of facilities that handle plastic materials is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

210.   Defendant has been in violation of the General Permit's Special Requirements of Facilities that Handle Plastic Materials every day since at least September 5, 2020. Defendant continues to be in violation of the Special Requirements each day that they fail to develop and fully implement the required BMPs for facilities that handle Plastic Materials.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

211.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

212.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendant failed and continues to fail to develop, implement, and/or revise an adequate MIP and monitoring program for the Facility, in violation of the General Permit.

213.   Defendant's ongoing failure to develop, implement, and/or revise an adequate MIP and monitoring program is evidenced by, *inter alia*, Defendant's failure to collect and analyze samples from all storm water discharge locations at the Facility and failure to collect and analyze samples from all required QSEs.

214.  Defendant has been in violation of the General Permit's monitoring requirements at the Facility every day from September 5, 2020 to the present.

215.  Defendant will continue to be in violation of Section X(I) and XI of the General Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

216.  Each day since at least September 5, 2020, that Defendant has failed to develop, implement, and/or revise an adequate MIP and monitoring program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Clean Water Act.

## FIFTH CAUSE OF ACTION
### Defendant's Failure to Satisfy Exceedance Response Requirements in Violation of the General Permit and the Clean Water Act
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

217.  Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

218.  Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continue to fail to take Exceedance Response Actions as required by General Permit Section XII.

219.  Plaintiffs are informed and believe, and thereon allege, that Defendant has been in daily and continuous violation of the General Permit's Exceedance Response Actions requirements since at least September 5, 2020.

220.  Each day since at least September 5, 2020 that Defendant fails to prepare and submit adequate ERA Reports for the Facility is a separate and distinct violation of the General Permit and Section 310(a) of the Clean Water Act, 33 U.S.C. § 1311(a). This is an ongoing and continuous violation of the Clean Water Act.

## SIXTH CAUSE OF ACTION

**Defendant's Failure to Comply with the General Permit's Requirement for Annual Reports**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

221.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

222.    Defendant has consistently failed to submit Annual Reports that comply with the requirements of Section XVI of the General Permit.

223.    Each day since at least September 5, 2020 that Defendant fails to prepare and submit adequate Annual Reports for the Facility is a separate and distinct violation of the General Permit and Section 310(a) of the Clean Water Act, 33 U.S.C. § 1311(a). This is an ongoing and continuous violation of the Clean Water Act.

## VIII.    <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth and respectfully requests that this Court grant the following relief:

a.    Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b.    Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.    Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.    Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.    Order Defendant to comply with the MIP requirements of the General Permit, including ordering supplemental monitoring to compensate for past monitoring violations;

f.    Order Defendant to prepare a SWPPP for the Facility consistent with the

requirements of the General Permit and implement procedures to regularly review and update the SWPPP;

g.    Order Defendant to implement the required BMPs under the Storm Water Permit's Special Requirements;

h.    Order Defendant to provide Plaintiffs with reports documenting the quality and quantity of their discharges to the Receiving Waters and their efforts to comply with the Clean Water Act and the Court's orders;

i.    Order Defendant to prepare and submit adequate ERA reports;

j.    Order Defendant to prepare and submit adequate Annual Reports;

k.    Order Defendant to pay civil penalties up to $68,445 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. § 19.4;

l.    Order Defendant to take appropriate actions to restore the quality of the water impaired or adversely affected by their activities;

m.    Award Plaintiffs' fees and costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

n.    Award any such other and further relief as this Court may deem appropriate.

Dated: November 5, 2025                    Respectfully submitted,

                                           /s/ Davina Shoumer
                                           Davina Shoumer
                                           Attorney for Plaintiff
                                           Orange County Coastkeeper
                                           Inland Empire Waterkeeper